```
             UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW HAMPSHIRE
```

Kimberly Tann

   v.                                     Civil No. 16-cv-449-JD
                                        Opinion No. 2017 DNH 070
Nancy A. Berryhill,
Acting Commissioner of
Social Security


O R D E R

Kimberly Tann seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Acting Commissioner of Social Security, denying her application for disability insurance benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 423 and § 1382. Tann contends that the Administrative Law Judge ("ALJ") erred in assessing the record evidence. The Acting Commissioner moves to affirm. Tann filed a response to the Acting Commissioner's motion.

Standard of Review

In reviewing the final decision of the Acting Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276

F.3d 1, 9 (1st Cir. 2001).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Castillo Condo. Ass'n v. U.S. Dep't of Housing & Urban Dev., 821 F.3d 92, 97 (1st Cir. 2016) (internal quotation marks omitted).  "[S]ubstantial evidence does not mean either uncontradicted evidence or overwhelming evidence" but instead can be satisfied "even if the record arguably could justify a different conclusion."  Id. (internal quotation marks omitted).

## Background

Tann applied for disability insurance benefits and supplemental security income on October 29, 2013, alleging that she had been disabled since April 20, 2012, due to chronic migraines, fibromyalgia, depression, anxiety, herniated disc, acid reflux, and insomnia.  After her applications were denied, Tann amended her onset date to August 27, 2013, when she was twenty-six years old.  She previously worked as an assembler, cleaner, as a personal care service provider, and in maintenance.

Tann's medical records pertinent to her onset date begin on August 14, 2013. At that appointment, Dr. George W. Lovett, a dermatologist, noted that Tann was in no distress, was alert and oriented, and had appropriate mood and affect. Dr. Lovett also noted edema in Tann's lower legs and that she was obese. A week later, Tann had injections in her cervical spine.

Dr. Natacha Sochat completed a physical residual functional capacity assessment on January 14, 2014. Dr. Sochat found that Tann could occasionally lift and carry up to twenty pounds, frequently lift and carry up to ten pounds, and sit and stand or walk for six hours in an eight hour day. Tann could occasionally do postural activities such as climbing, balancing, stooping, crouching, kneeling, and crawling.

At the end of January, 2014, Dr. Sharon Ferguson noted that Tann's anxiety and depression were controlled with medication and her depression had improved. Dr. Ferguson urged Tann to restart counseling. Dr. Ferguson found that Tann was not in acute distress, did not have edema, had appropriate affect, and did not appear to be anxious or depressed.

On February 12, 2014, Sherie Friedrich, Psy.D., examined Tann to evaluate her psychological condition. Dr. Friedrich made observations about Tann's appearance and affect and recorded Tann's reports about her feelings and daily activities.

Tann was alert and oriented during the examination. Dr. Friedrich noted Tann's report that she was unable to adequately complete chores when she was experiencing a lot of pain. In a work setting, however, Tann could interact appropriately, understand work procedures, follow simple instructions, maintain concentration and complete tasks, tolerate stress that is common in a workplace, and make simple decisions. Dr. Friedrich also stated that Tann would benefit from psychotherapy to address her "maladaptive behaviors."

On March 4, 2014, Patricia Salt, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique based on a review of Tann's records. Dr. Salt concluded that Tann did not have a severe mental impairment.

Tann was seen on June 5, 2014, for a follow up on her chronic headaches by Nurse Finley-Bruno. The treatment notes include Tann's reported symptoms of her headaches, which were moderate but could become severe with pressure and pounding that caused nausea. Tann further reported that she would need to lie down in a dark room when experiencing a severe headache and that the headache could last up to forty-eight hours.

Tann explained that she had stopped taking her migraine headache medicine when she discovered that she was pregnant and had been having headaches for two months. She also said that

she had broken up with her boyfriend because of disputes over custody of their son and his abusive behavior, which caused her to have stress. Despite having a headache during the examination with pain at the level of 6 out of 10, the provider reported that Tann was in no acute distress and that her head and neck range of motion was normal. Tann stated that triggers for her headaches were stress, chemical smells, fluorescent lights, and heavy perfume.

Tann reported headaches on September 29, 2014, with a pain level of 6.5 out of 10. On January 20, 2015, Tann saw Nurse Finley-Bruno and reported a headache pain level of seven out of ten. Finley-Bruno, however, found that Tann was not in acute distress, her mood and affect were normal, she was alert and oriented, and was not ataxic.[1] Nurse Finley-Bruno indicated that Tann intended to take her headache medication again post-pregnancy. At an appointment on March 11, 2015, Tann again reported a headache pain level of 7 out of 10, but Nurse Finley-Bruno noted that Tann was in no acute distress, her mood and affect were normal, she was alert and oriented, and she was not ataxic.

On April 3, 2015, Dr. Ferguson increased Tann's medication to better control her anxiety and depression. He also

---

[1] Ataxia refers to a lack of motor control or coordination.

recommended that she increase exercise.  Tann was in no acute distress and all of Dr. Ferguson's observations provided normal results.  Nurse Finley-Bruno also found normal results on June 18, 2015, despite Tann's report of daily stress and headaches and a pain rating of 7 out of 10.  Tann was given a shot in her cervical spine and continued on her other mediations.

Dr. Thomas Ward completed a Headache Residual Functional Capacity Questionnaire on September 15, 2015.  Dr. Ward stated that he had treated Tann intermittently since December 31, 2012, and noted that she had had chronic and constant migraine headaches.  He wrote that Tann's headaches were "mild/moderate/to severe pressure/pounding/sharp with nausea/vomiting and light/sound sensitivity."  He wrote that triggers were bright light, stress, moving around, and noise.

Dr. Ward said that Tann had a good response with Botox treatment but still had daily headaches that would preclude even basic work activities.  He also said that she would need daily unscheduled breaks from work because of headaches and thought she would miss more than four days of work each month when she was completely disabled due to headaches.

A hearing was held before an ALJ on September 22, 2015.  Tann was twenty-nine years old at the time of the hearing.  She was living with her mother and her two children.

Tann testified about her physical ailments and treatment for fibromyalgia, a herniated disk in her lower back, and headaches.  She also testified that she had been seeing a therapist for depression and anxiety and was taking medication that controlled her mental impairments.  Tann also described her daily activities and the effects of her headaches.

A vocational expert, Ralph Richardson, also testified at the hearing.  Based on the hypothetical presented, Richardson responded that Tann could not do any of her previous work but would be able to do sedentary jobs, such as bench worker, general office clerk, and order clerk.  With additional limitations, including increased absences, Richardson found no work that Tann could do.

The ALJ issued a decision on October 5, 2015, denying Tann's applications.  The ALJ found that Tann had severe impairments due to migraines, degenerative disc disease, and fibromyalgia.  The ALJ also found that despite her impairments Tann had the residual functional capacity to do light work with a restriction on standing and walking and only occasional postural activities.  The ALJ also found that Tann would need to avoid perfume, odors, bright lights and would need a low stress environment, meaning that there would be little change in the work setting and no need to exercise judgment.  Based on that

7

assessment, the ALJ found that jobs existed in the national economy that Tann could do. The Appeals Council denied her request for review, making the ALJ's decision the decision of the Acting Commissioner.

## Discussion

Tann moves to reverse the Acting Commissioner's decision, arguing that the ALJ erred in failing to make findings about her ability to handle stress, improperly weighed the medical evidence, and erred in not finding a severe impairment due to obesity. The Acting Commissioner moves to affirm. Tann filed a response to the Acting Commissioner's motion.

In determining whether a claimant is disabled, the ALJ follows a five-step sequential analysis. 20 C.F.R. § 404.1520.[2] The claimant bears the burden through the first four steps of proving that her impairments preclude her from working.[3] Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth

---

[2] Because the pertinent regulations governing disability insurance benefits at 20 C.F.R. Part 404 are the same as the pertinent regulations governing supplemental security income at 20 C.F.R. Part 416, the court will cite only Part 404 regulations. See Reagan v. Sec'y of Health & Human Servs., 877 F.2d 123, 124 (1st Cir. 1989).

[3] The first four steps are (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether she has a severe impairment; (3) determining whether the impairment meets or equals a listed impairment; and (4) assessing the claimant's residual functional capacity and her ability to do past relevant work. 20 C.F.R. § 404.1520(a).

step, the Acting Commissioner has the burden of showing that jobs exist which the claimant can do. Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).

A. Ability to Handle Stress

Tann contends that the ALJ erred by failing to question her at the hearing about her ability to handle stress and about whether her past work was stressful. She also contends that the ALJ erred in failing to make findings about her ability to handle stress. Tann argues that ALJs are required to be thorough and individualized in assessing stress and that the ALJ in her case did not meet that standard.

In support, Tann relies on Titles II and XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, Social Security Ruling ("SSR") 85-15, 1985 WL 56857 (January 1, 1985); and Lancellotta v. Sec'y of Health & Human Servs., 806 F.2d 284 (1st Cir. 1986). In Lancellotta, the First Circuit considered a claimant with a severe mental impairment and the ALJ's finding that although the claimant could not perform his past work he could perform other "low stress" jobs. Id. at 285. The court held that substantial evidence did not support the ALJ's finding because the ALJ failed to explain why the claimant could do the identified jobs despite the low stress limitation. Id. The

9

court noted "that stress is not a characteristic of a job, but instead reflects an individual's subjective responses to a particular situation" and that there was no basis for the ALJ's finding that the claimant could do low stress work. Id.

In contrast, here the ALJ found that Tann had severe <u>physical</u> impairments. To the extent Tann contends that the ALJ was required to develop the record to show that stress or her reaction to stress was a severe mental impairment, she is mistaken. Tann bore the burden of showing through objective medical evidence that she had a medically determinably mental impairment that significantly limited her ability to work. See Gardiner v. Colvin, 2015 WL 6504802, at *8 (D.R.I. Oct. 27, 2015); Rascoe v. Comm'r of Social Security, 103 F. Supp. 3d 169, 182 (D. Mass. 2015). Tann does not argue that the ALJ's Step Two findings were wrong in that regard.

The ALJ found that Tann was unable to do her past work because of physical limitations, including migraine headaches that could be triggered by stress. Unlike the situation in <u>Lancellotta</u>, however, here the ALJ explained what he intended as low stress work. Tann has not shown that the ALJ's limitation was insufficient to address that issue. Therefore, the ALJ's explanation satisfies the need for considering a claimant's individual needs under <u>Lancellotta</u>. See Degraffenreid v.

10

Colvin, 2016 WL 5109509, at *8 (D. Mass. Sept. 20, 2016); Poulin v. Colvin, 2015 WL 237326, at *2-*3 (D. Me. Jan. 18, 2015).

B. Medical Opinion Evidence

Tann contends that the ALJ erred in giving little weight to Dr. Ward's opinions about the nature and effects of her migraine headaches. She also contends that the ALJ erred in giving no weight to the functional capacity assessment done by "OT Saun." The Acting Commissioner argues that the ALJ properly assessed Dr. Ward's opinion and asserts that the ALJ considered the occupational therapist's evaluation.

An ALJ is required to consider the medical opinions along with all other relevant evidence in a claimant's record. 20 C.F.R. § 404.1527(b). Medical opinions are evaluated based on the nature of the medical source's relationship with the claimant, the consistency of the opinion with the other record evidence, the medical source's specialty, and other factors that may be brought to the ALJ's attention. § 404.1527(c). "[U]nder the treating source rule, controlling weight will be given to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Arrington v. Colvin, --- F. Supp. 3d -

--, 2016 WL 6562550, at *16 (D. Mass. Nov. 3, 2016) (internal quotation marks omitted). On the other hand, the ALJ may give little weight to a treating source's opinion if that opinion "is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians." Glynn v. Colvin, 2017 WL 489680, at *2 (D. Mass. Feb. 6, 2017).

   1. Dr. Ward's Opinion

Dr. Ward recorded in his Headache Residual Functional Capacity Questionnaire that Tann had daily constant headaches with exacerbations that could last up to forty-eight hours. He also indicated that the headaches were made better by Botox and Verapamil. Dr. Ward believed that Tann could tolerate low stress work, that she would require unscheduled breaks and likely be absent more than four days each month, and that she was completely disabled by headaches.

The ALJ considered Dr. Ward's opinion but decided to give it little weight.[4] The ALJ noted that Dr. Ward indicated Tann had exacerbations of her headaches but he did not indicate how often the exacerbations would occur. The ALJ also noted that Dr. Ward's opinion was contradicted by Tann's testimony that she

---

   [4] In parts of his decision, the ALJ misidentified Dr. Ward as Dr. Warden.

12

had headaches with a pain level of five out of ten and was able to function normally and by Dr. Ward's treatment notes showing that medication helped Tann's headaches. The ALJ also found that Dr. Ward's opinion about Tann's likely absences was not supported by the record and that Tann's activity level also did not support that level of severity and frequency of headaches.

Dr. Ward's treatment notes for Tann begin on December 31, 2012.[5] Dr. Ward reported Tann's description of her headaches, their history, and her symptoms.[6] On examination, Dr. Ward found no abnormalities. He changed her medication and recommended a book, "Conquering Headaches."[7] Tann's subsequent medical records show that although she reported headache pain at a level up to seven out of ten at various medical appointments, she was able

---

[5] Although Tann cites the earlier records in support of her motion to reverse, the joint factual statements begins with medical records in August of 2013.

[6] Statements in a medical record that merely repeat a claimant's subjective complaints are not medical opinions because the notes are not "'statements . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, and what you can still do despite impairment(s), and your physical or mental restrictions.'" Hesson v. Colvin, 2015 WL 7259747, at *4 (D. Me. Sept. 29, 2015) (quoting 20 C.F.R. § 416.927(a)(2)).

[7] The only cited objective medical test result in the record is an MRI done in April of 2012, which apparently did not show any related abnormality. Although Tann also had a lumbar spinal puncture to assess intracranial pressure done in 2013, Tann cites no records or opinions to show those results.

13

to function normally, appeared to be in no acute distress, and had normal results on neurological examination.

The medical records also show that Tann was able to take care of her son, visit her boyfriend, do grocery shopping, pay bills, do household chores, prepare food, and attend medical appointments despite her headaches. Although Tann testified that her daily activities were limited when she was in pain above a level of five out of ten, the ALJ found that she was not entirely credible as to the severity, intensity, and limiting effects of her headaches. Tann has not challenged the ALJ's credibility determination.

### 2. The Occupational Therapist's Evaluation

Tann contends that the ALJ erred in failing to accord any weight to the opinion of "OT Saun," meaning the evaluation done by Occupational Therapist Joan Van Saun.[8] The parties' joint statement of material facts, which must include "all facts pertinent to the decision of the case and all significant procedural developments," does not mention Van Saun's

---

[8] In support, Tann cites Titles II and XVII: Considering the opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, SSR 06-3p, 2006 WL 2329939 (Aug. 9, 2006), which explains the requirement that an ALJ must consider evidence from all sources. Contrary to Tann's theory, however, there is no requirement that the ALJ must always assign a particular weight to that evidence.

14

evaluation.  LR. 9.1(c).  As such, Tann may have waived any issue pertaining to that evaluation.  See Lawton v. Astrue, 2012 WL 3019954, at *9 (D.N.H. July 24, 2012).

In any case, the ALJ considered Van Saun's evaluation, which was done in February of 2013.  The ALJ noted the functional evaluation and Tann's report about her headache pain and medication.  The ALJ also noted that Tann told the occupational therapist that she was unable to find work in her area and that transportation was a problem.

Van Saun found that Tann was able to do postural activities such as squatting and kneeling, without difficulty.  She could lift and carry up to twenty-five pounds occasionally, and she could lift and carry up to fifteen pounds frequently.  Her push and pull strength was fairly strong.  Tann could sit for up to an hour, stand for up to a half-hour, and walk for up to an hour at a time.  Van Saun determined that physically Tann was capable of working full time at an exertional level of up to light physical demand.

The ALJ's residual functional capacity finding generally follows Van Saun's assessment.  Tann argues, nevertheless, that the ALJ erred in failing to incorporate two of Van Saun's limitations into the residual functional capacity. Specifically, Tann cites Van Saun's recommendations that bending

would increase her back pain and put her at risk of injury and that she would do best if she could change positions, "optimally stand and walk for 5-10 minutes per one hour of sitting."

The differences cited by Tann are minimal. Van Saun found that Tann could squat, kneel, and half kneel without limitation. The ALJ found that Tann could do those activities only occasionally. Although the ALJ did not mention bending specifically, the other postural limitations limit such activities to only occasionally, which is consonant with Van Saun's recommendations.

The ALJ added a restriction that Tann must have the opportunity to stand for five minutes each hour. Van Saun's recommendation for a standing option to last five to ten minutes was for the optimal situation, not a requirement. Therefore, the ALJ's restriction is well within the limits set by Van Saun.

C. Obesity

Tann contends that the ALJ erred in failing to assess the effects of her obesity at Step Two, as required by Titles II and XVI: Evaluation of Obesity, SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). She argues that because obesity can compound the effect of other impairments, the ALJ should have considered the effect of obesity on her migraine headaches, degenerative disc disease, and fibromyalgia. She further asserts that the ALJ had

16

the duty to develop the record to show that she was disabled by the effect of obesity on her other impairments.

Tann is mistaken. At Step Two, the claimant bears the burden of providing evidence of a medically determinable severe impairment or severe combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 146 & 149 (1987). While an ALJ has a responsibility to fill gaps in a claimant's medical records when the record presented is inadequate, Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991), Tann has not shown that any gaps existed in her records. In addition, Tann was represented by counsel through the administrative process and on judicial review.

The ALJ found that migraines, degenerative disc disease, and fibromyalgia were severe impairments and considered the effects of those impairments on Tann's ability to function. Tann provides no evidence that her obesity compounded those impairments or that other evidence existed that would show that to be the case.[9] Therefore, Tann has not shown that the ALJ had a responsibility to develop the record as to what, if any, effect her obesity might have had on her other impairments.

---

[9] The treatment records, evaluations, and opinions in the record acknowledge Tann's weight and height. In addition, Van Saun assessed Tann's functional capacity in light of her obesity.

17

Substantial evidence supports the Acting Commissioner's decision, which is affirmed.

## Conclusion

For the foregoing reasons, the claimant's motion to reverse (document no. 8) is denied. The Acting Commissioner's motion to affirm (document no. 9) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

*Joseph A. DiClerico, Jr.*
Joseph DiClerico, Jr.
United States District Judge

April 10, 2017

cc: Penelope E. Groneck, Esq.
　　Terry L. Ollila, Esq.

18